**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-677-TSC** |
| **MOISES ROMERO,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The government requests that this Court sentence Moises Romero to 11 months' incarceration, the middle of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and the mandatory $100 special assessment.

## I.   INTRODUCTION

Romero not only participated, but also enabled others to participate, in the January 6, 2021 Capitol Breach, a violent attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

Romero came to the Capitol ready for a confrontation with police, wearing a dual-cartridge respirator and eye-protection safety glasses. He entered the restricted Capitol Grounds and took

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

videos of rioters assaulting officers with poles and a fire extinguisher in the West Plaza. He joined a group of rioters that pushed past police to occupy bleachers set up for the inauguration, and later led a group that forcibly pushed through a makeshift police barricade at the Senate Wing Door to gain entrance to the Capitol, grabbing the edge of an officer's riot shield in the process. After spending about 15 minutes celebrating, taking videos, and entering Senator Merkley's office, Romero left the building, only to return to the east side of the Capitol, joining yet another group of rioters trying to gain entrance to the Capitol through the Rotunda Doors. The next day, Romero posted a video on social media, proudly displaying himself inside and around the Capitol Building.

The government recommends that the Court sentence Romero to 11 months' incarceration, which is the middle of the applicable 8 to 14 months range. An 11-month sentence acknowledges his admission of guilt, but also reflects the gravity of Romero's conduct and the need to deter Romero and others from similar conduct.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Romero among them, attacked the U.S. Capitol to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked the place—vandalizing, damaging, and/or stealing artwork, furniture, and other property. Although the facts and the circumstances of the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-

CR-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As explained in the PSR and the Statement of Offense incorporated into Romero's plea agreement, a joint session of Congress convened at around 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By around 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police ("USCP") were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals unlawfully forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the USCP attempted to keep the crowd from entering, but shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At about 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at about 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense at ¶¶ 1-3; PSR at ¶¶ 12-17.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

The rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at*

https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

The rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million. *See* PSR ¶ 16.

***Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds***

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the USCP defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Image 2: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against

the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Image 2 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Image 2. They flooded the area labeled "Lower West Plaza," Area C on Image 2, pushing against the barricade there.



*Image 3: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and

the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.

At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and

then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. through the Senate Wing Door to build to a torrent.



*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Breach of the Capitol Building at the Senate Wing Door*

One of the main breach points through which rioters entered the Capitol Building itself was an entryway on the west side of the Senate Wing, next to the Northwest Courtyard of the Capitol ("Senate Wing Door"). In Images 5 and 6 below, the Senate Wing Door is circled in red.



*Image 5: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525*

The area consists of a door, with windows on either side, pictured below.



*Image 6: Screenshot from open source video depicting Senate Wing door as it appeared at about 2:13 pm on January 6, 2021*

At about 1:48 p.m., rioters in the West Plaza broke through a police line at the base of the Northwest Scaffolding and climbed the steps underneath leading to the Upper West Plaza. Rioters under the Northwest Scaffolding were stopped temporarily by police, but at about 2:09 p.m., they broke through and streamed up the stairs to the Northwest Courtyard. Many of these rioters headed straight towards the Senate Wing Doors.

At about 2:13 p.m., rioters broke the windows next to the Senate Wing Door, entered through those windows, and opened the Senate Wing Door from the inside.



*Image 7: Screenshot from open source video*



*Image 8: Screenshot from USCP Security Footage*

Rioters began streaming into the building through the main door and the surrounding windows. Broken glass littered the ground, and a piercing alarm sounded, audible to anyone in the area.

**B.  Romero's Role in the January 6, 2021, Attack on the Capitol**

Romero traveled to Washington, D.C. by plane on January 5. He attended the rally, bringing with him a distinct hand-drawn sign. One side of the sign stated "Fuck Riggirs Pedos China," and opened up to reveal an image of a frog surrounded by the words "Attention! Trump

WON America First!" and "Fuck Joggers! Fuck Riggers! Fuck the GOP! You will never be woman – Anon." On the opposite side, Romero's sign stated "Dial Rudy 2020 #Sneed." Romero took photographs of the sign in his hotel room before attending the rally:



*Images 3, 4, and 5: photographs obtained from Romero's cellphone*

After the rally, Romero walked to the Capitol, entering the Capitol Grounds by walking over the fallen barricades near the Peace Circle, and stopping to take video of the crowd behind him. *See* Exhibit 1.[2]



*Screenshot from Exhibit 1 at :08*

---

[2] Exhibit 1 is a video labeled "IMG_2281.mov" found on Romero's cellphone.

Romero walked to the West Plaza, where he stopped to take video, turning the camera on himself and displaying the eye protection and dual-cartridge respirator he brought to the Capitol. *See* Exhibit 2.[3]



*Screenshot from Exhibit 2 at :06*

While on the West Plaza, Romero recorded the reactions of fellow protesters to the tear gas being used by the USCP to keep the rioters at bay ("I'm being gassed"). *See* Exhibit 3.[4]  At times, Romero's camera showed portions of the sign he was holding.

---

[3]  Exhibit 2 is a video labelled "IMG_2285.mov" found on Romero's cellphone.
[4]  Exhibit 3 is a video labelled "IMG_2290.mov" found on Romero's cellphone.

 


*Screenshot from Exhibit 3 at :01*     *Screenshot from Exhibit 3 at :03*

Romero also recorded rioters confronting the police by throwing objects and emptying the

contents of a fire extinguisher at the police. *See* Exhibit 4.[5]

  

*Screenshots from Exhibit 4 at :04, :06, and :18*

---

[5] Exhibit 4 is a video labelled "IMG_2299.mov" found on Romero's cellphone.

Around 2:15 p.m., Romero climbed the steps under the Northwest Scaffolding and walked on to a ledge above the West Plaza, indicated by the purple circle on Image 5. From his vantage point, Romero recorded images of the police still in control of the Lower West Terrace and the rioters fighting with police down below on the West Plaza. *See* Exhibit 5.[6]

 

*Screenshots from Exhibit 5 at :05, :09*

In the image below, Romero, holding up his sign, can be seen among other rioters occupying the ledge above the West Plaza.

---

[6] Exhibit 5 is a video labelled "IMG_2305.mov" found on Romero's cellphone.



*Image 6: Photograph DSC08913.jpg by photojournalist Lev Radin*

Around 2:28 p.m., rioters on the ground below Romero broke through the police line at the

West Plaza. Shortly thereafter, Romero and the other rioters on the ledge moved towards the Lower

West Terrace. There, the rioters confronted the police defending the passage. In the photograph

below (enlarged for clarity), Romero's sign is visible among the rioters pushing against police.



*Image 7: Photograph CQ8T4879.jpg from photojournalist Lev Radin*

Around 2:31 p.m., Romero and the other rioters pushed through the police line and entered

the Lower West Terrace. *See* Exhibit 6.[7]



*Screenshot from Exhibit 6 at 1:27*

After breaking through at this point, Romero stopped briefly to hold up his sign at the crowd below

before other officers arrived.



*Screenshot from Exhibit 6 at 1:38*

As police attempted to subdue this group of rioters with pepper spray, Romero climbed up the

Northwest Riser and headed towards the Capitol Building. *See* Exhibit 6.

---

[7] Exhibit 6 is an excerpt of security video taken by a camera atop the Capitol Building. Exhibit
5A depicts the original camera view, followed by an enlarged image of the same footage for
clarity.



*Screenshot from Exhibit 6 at 2:03*

Romero continued until he reached the Northwest Courtyard, where he stopped again to take video of himself. *See* Exhibit 7.[8]



*Screenshot of Exhibit 7 at :02*

By around 2:43 p.m., Romero had arrived outside the Senate Wing Door, in the area indicated by the red circle on Image 5. At this time, USCP officers had managed to temporarily stop rioters from entering through the Senate Wing Door. While rioters were being directed to

---

[8] Exhibit 7 is a video labelled "IMG_2307.mov" found on Romero's cellphone.

leave the building through one of the broken windows, the officers had closed the other window

and had created a makeshift barrier in front of the Senate Wing Door. Romero took video of the

barrier and the officers, holding riot shields and clad in riot gear, who stood behind it. *See* Exhibit

8.[9]



*Screenshot from Exhibit 8 at :01*

At this time, the rioters outside the door were shouting "Fuck you" at the officers and

accusing them of being "Communists." Exhibit 9 is a video from another rioter showing Romero's

position in front of the Senate Wing Door as this was happening.[10]

---

[9] Exhibit 8 is a video labelled "IMG_2313.mov" found on Romero's cellphone.

[10] Exhibit 9 is a publicly available video located at https://projects.propublica.org/parler-capitol-videos/?id=vcPQ3OgnxB15.



*Screenshot from Exhibit 9 at :04*

Around 2:47 p.m., several of these rioters, including Romero, forced their way into the Capitol by pushing the barrier out of the way and into the defending officers. Exhibit 10 is an excerpt of USCP security video showing the attack and subsequent breach.[11]

The confrontation began when Romero (indicated with a red arrow) and other rioters moved into the doorway and rushed the temporary barrier. Their initial attack was partially successful, pushing the temporary barrier further into the building. *See* Exhibit 10 at :13 - :15.

---

[11] For clarity, Exhibit 10 first shows the breakthrough, and then shows the scene a second time, with Romero spotlighted.



*Screenshot from Exhibit 10 at :14*

Several USCP officers ran to support the temporary barrier as additional rioters, including Romero, rushed in through the doorway.



*Screenshot from Exhibit 10 at :17*

For the next several seconds, officers tried to push rioters out of the doorway while the rioters pushed forward. Exhibit 11 is a video of the scene outside the door at this time, as someone

23

describes the attack, stating, "Here's the next rush. There's a push inside, with resistance."[12]



*Image from Exhibit 11 at :09*

During the struggle, a USCP officer used a riot shield to push the rioters back. The shield hit Romero's arm several times. Undeterred, Romero grabbed the shield with his hand. In the image below, Romero's hand, in a distinctive fingerless glove, can be seen grabbing the riot shield.

---

[12] Exhibit 11 is a publicly available video located at https://projects.propublica.org/parler-capitol-videos/?id=dM4L9bbfDmJ1.



*Screenshot from Exhibit 10 at 1:00*

Romero and the other rioters continued their efforts, pushing forward against the officers and the temporary barrier. During the struggle, Romero braced himself against the wall with his hand for leverage.



*Screenshot from Exhibit 10 at 1:10*

As the rioters continued to press, Romero moved forward, continuing to use the wall for leverage.

25



*Screenshot from Exhibit 10 at 1:17*

At around 2:48 p.m., Romero and the other rioters broke through the police line. Like a dam bursting, rioters poured through the doorway, and the officers lost control of the doorway, the adjacent windows, and this section of the Capitol.

Once inside, Romero took a video, turning the camera on himself and giving a celebratory yell, shouting, "We in this motherfucker!" *See* Exhibit 12.[13] At times, the office of Senator Merkley of Oregon is visible behind Romero in the video. *See id.*

---

[13] Exhibit 12 is a video posted to Romero's Instagram account on January 7, 2021.



*Screenshots from Exhibit 12 at :02, :05*

Romero then entered Senator Merkley's office briefly before exiting. *See* Exhibit 13.[14]

---

[14] Exhibit 13 is an excerpt of a public video available at https://youtu.be/f80ScBHnNRk. At 11:36 p.m. on January 6, Senator Merkley posted a three-minute-long video to Twitter showing the damage that his office incurred during the riot. The video is available on Twitter at https://twitter.com/SenJeffMerkley/status/1347039504528498688. Senator Merkley explained that rioters appear to have "smashed the door virtually off its hinges," even though the door was unlocked. He said that the rioters "left a Trump flag here to mark their presence." The senator narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes on a table to discuss how the rioters appear to have been "smoking something" in the office. In Senator Merkley's words, one can "count this office trashed."



*Screenshot from Exhibit 13 at :14*

He then headed south, towards the Crypt. Around 3 p.m., Romero walked through the Crypt

and continued south, taking another video of himself. *See* Exhibit 14.[15]



*Screenshot of Exhibit 14 at :01*

---

[15] Exhibit 14 is a video labelled "IMG_2316.mov" found on Romero's cellphone.

Romero exited the Capitol Building through the South Door at 3:03 p.m., having been inside for about 15 minutes.

Romero then travelled to the east side of the Capitol and walked up the steps to the Rotunda Doors, indicated by the blue circle on Image 5 (page 12). At this time, the entrance was blocked by police, and a loud siren was sounding. *See* Exhibit 15.[16] Romero (circled in red) joined the other rioters demanding to be let inside, and chanting "Our House!" *See* Exhibit 16.[17]



*Screenshot from Exhibit 16 at 1:12*

Romero also took video of the rioters attempting to enter the Capitol. *See* Exhibits 17 &

---

[16] Exhibit 15 is a video labelled "IMG_2323.mov" found on Romero's cellphone.

[17] Exhibit 16 is a video found on the cellphone of another Capitol Breach defendant.

18.[18]



*Screenshot from Exhibit 17 at :05*



*Screenshot from Exhibit 18 at :04*

At the base of the steps on the East Side of the Capitol, Romero took more video of himself,

smiling and holding up a "victory" sign. *See* Exhibit 12 at :12.

---

[18] Exhibit 17 is a video labelled "IMG_2317.mov" found on Romero's cellphone. Exhibit 18 is a video labelled "IMG_2319.mov" found on Romero's cellphone.



*Screenshot from Exhibit 12 at :12*

The next day, Romero posted a video to his Instagram account consisting of a montage of video and photos he had taken at the Capitol. Rather than expressing remorse or regret, Romero's video showed how much fun he had and how proud he was of his actions. *See* Exhibit 12. Romero included a screenshot bearing the words "Fuck around and find out" above a purported news headline stating "News: Pro-Trump Protestors Storm Capitol Building as Congress Meets." At one point, Romero superimposed the phrase "Right before stormed in" over a photograph of rioters confronting police on the West Plaza.

31



*Screenshot from Exhibit 12 at :44*



*Screenshot from Exhibit 12 at :53*

## III.   THE CHARGES AND PLEA AGREEMENT

On September 23, 2021, Romero was charged by complaint with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). On October 7, 2021, Romero was arrested in Florida and released on bond. On November 17, 2021, a federal grand jury returned an indictment charging Romero with the same violations alleged in the complaint. On March 16, 2021, Romero pleaded guilty to Count 1 of the Indictment, charging a violation of 18 U.S.C. § 231(a)(3).

32

## IV.    STATUTORY PENALTIES

Romero now faces sentencing on a single count of Civil Disorder, in violation of 18 U.S.C.

§ 231(a)(3). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up

to five years of imprisonment, a fine of up to $250,000, and a term of supervised release of not

more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at

49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

According to the PSR, the U.S. Probation Office calculated Romero's adjusted offense level under

the Sentencing Guidelines as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | [10] |
| U.S.S.G. § 2A2.4(b)(1)(A) | Offense Involving Physical Contact | [+3] |
| | Total | [13] |

*See* PSR at ¶¶ 27-34.

The government agrees that Romero has demonstrated acceptance of responsibility for the offense, and that a two-level reduction under Guidelines Section 3E1.1(a) is appropriate. *See* PSR at ¶ 36.

The U.S. Probation Office calculated Romero's criminal history as a category I, which is not disputed. *See* PSR at ¶ 40. Accordingly, the U.S. Probation Office calculated Romero's total offense level at 11, and his corresponding Guidelines imprisonment range at 8-14 months. *See* PSR at ¶ 90. Romero's plea agreement contains an estimated Guidelines range calculation that mirrors the U.S. Probation Office's calculation.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). As described below, the Section 3553(a) factors warrant incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who participated in the riot did so under the most extreme of circumstances, to which their conduct directly contributed. Anyone who made it to the Capitol would—at a minimum—have crossed through several barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, besides their own acts of violence, they likely would have observed other extensive fighting with law enforcement. Romero and the other rioters successfully shut down the certification of the electoral vote count for several hours, as members of Congress and their staff were forced to take shelter from the violence. As noted above, the rioters injured over a hundred law enforcement officers and terrified individuals on scene that day, leaving significant emotional scars. They created more than $2.7 million in losses. This number understates the extent of the property damage, as it does not include the irreparable and unquantifiable damage to artwork, statues, and other artifacts that were stolen or damaged.

When looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or

contrition. While these factors are not exhaustive nor dispositive, they help place each individual defendant on a spectrum as to their fair punishment.

The nature and circumstances of Romero's crime weigh heavily towards a term of incarceration. Unlike many other January 6 defendants, Romero did not just walk into the Capitol. He forced his way in, first by pushing through a police line at the Lower West Terrace, and later by pushing through the makeshift police barrier and the officers defending the Senate Wing Door. Nor were Romero's actions spontaneous or provoked. The fact that Romero brought eye protection and a respirator to the Capitol demonstrated he anticipated violence, and specifically the kind of violence that would require the police to use tear gas. Before he confronted police himself, he saw the rioters attacking the outnumbered police on the West Plaza with sticks, fire extinguishers, and other objects. Rather than leaving, he video-recorded the attacks and took videos of himself.

When Romero pushed through the police at the Lower West Plaza, he did so in conjunction with the rioters breaking through the police line below him on the West Front. He saw the police were outnumbered and being attacked from multiple directions. When Romero arrived at the Senate Wing Door, he could see that outnumbered police officers had set up a barricade to stop rioters from entering the building. Instead of moving away, Romero moved forward, putting himself at the front line of the rioters, and pushing through the barricade and through the police line. During the push, Romero braced himself against the wall, using his resulting leverage to apply force against the police. He also grabbed the edge of a police officer's riot shield during the struggle. Given all he had experienced that day, his participation in this push was deliberate and premeditated and cannot be ascribed to the heat of the moment. And the harm caused by Romero's conduct was multiplied because his actions re-opened a major breach point, enabling a swarm of

rioters to enter the building.

After forcing his way into the Capitol building, Romero celebrated his actions, recording video, and yelling "We in this motherfucker!" He stayed in the Capitol for 15 minutes, taking multiple videos and entering Senator Merkley's private office.

After exiting the Capitol, Romero did not leave the Capitol Grounds, but circled around the building and climbed the east side steps to the Rotunda Doors. There, Romero joined other rioters demanding entry into the building, shouting "Our House!" But for the police's successful defense of the Rotunda Doors at the time (though they had earlier been breached), Romero would very likely have re-entered the Capitol Building. Romero also celebrated by taking a selfie while flashing a "victory" sign with his fingers.

Rather than showing remorse for his participation in the assault on the Capitol, Romero was proud of it. He wanted people to know what he had done, and so he put together a composite video and disseminated it on social media. Romero's pride in his actions at the Capitol and his lack of remorse in the immediate aftermath of January 6 show the need for a substantial sentence.

**B.      The History and Characteristics of the Defendant**

Romero has no prior criminal history, has complied with the conditions of his release, and agreed to plead guilty and accept responsibility relatively soon after his arrest. He agreed to be debriefed by law enforcement and provided truthful information. As the PSR notes, Romero worked as a nurse in the emergency department of a hospital during the height of the COVID-19 pandemic. *See* PSR at ¶ 72. These aspects of his history and characteristics are mitigating, though

as discussed below, Romero's education and professional training mean that he understood well that his actions were illegal.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[19]  As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. When Romero made his way through the Capitol Grounds to the Senate Wing Door, it was abundantly clear to him that lawmakers, and the law enforcement officers trying to protect them, were under siege by rioters engaged in a civil disorder. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. Romero directly, and physically, added to that danger by his use of force. And his actions against uniformed police officers show disrespect for the law.

The government submits that this factor also requires a sentence of imprisonment. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that crimes against police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.      The Need for the Sentence to Afford Adequate Deterrence**

---

[19] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[20] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I

---

[20] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

39

don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

On January 6, Romero made a series of choices. He could have stayed at the rally, peacefully protesting, but he chose to march on the Capitol and enter restricted grounds. When he saw rioters attacking police, and saw police using pepper spray in defense, he could have walked away, but he chose to move forward. After he burst through a police line at the Lower West Terrace with other rioters, he could have stayed outside the Capitol, but he chose to go inside. When he saw vastly outnumbered police defending a makeshift barrier at the Senate Wing Door, he could have respected the police line; instead, he chose to forcefully push the barrier into the police and force his way into the Capitol. And having entered the Capitol once, Romero could have left the area; instead, he joined rioters trying to enter the Capitol at another location. And when it was all over, Romero could have been contrite or remorseful about his actions, but he chose to disseminate a video publicly displaying his pride at what he had done.

Romero is an educated man. He knew it was wrong to storm the Capitol. He knew it was wrong to attack police. He did it anyway. The government requests a sentence significant enough to deter Romero from ever again making the choice to use violence in pursuit of his political

40

beliefs.

**E.    The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines."  *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide the most helpful benchmark. As this Court knows, the government has charged many persons with crimes based on the January 6 riot, including hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.      Unwarranted Sentencing Disparities

As to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities— "'the Sentencing Guidelines are themselves an anti-disparity formula.'" *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021) (quoting *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Generally, when a district court "correctly calculated and carefully reviewed the Guidelines range, [the district court] necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). Put another way, "'the best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'" *Sanchez*, 989 F.3d at 541 (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).

The crimes that Romero and others like him committed on January 6 are unprecedented. For that reason, Romero's violation of 18 U.S.C. § 231(a)(3) is not comparable to § 231(a)(3) offenses committed in non-January 6 circumstances. To try to mechanically compare other

defendants before January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

To date, only three January 6 defendants for whom the sole count of conviction was a violation of § 231(a)(3) have been sentenced: *United States v. Daniel Johnson and Daryl Johnson*, 21-cr-407-DLF, *United States v. Nolan Cooke*, 22-cr-52-RCL, and *United States v. Derrick Evans*, 21-cr-337-RCL.

Daniel Johnson, and his father, Daryl Johnson, entered the Capitol in the second wave of rioters on the west side, climbing through a broken window and then joining the crowd inside the building on the east side. They helped other rioters overwhelm the outnumbered officers to allow more rioters to enter building through the Columbus doors on the east side, putting the officers and others at risk of injury. Both defendants pled guilty to Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). There was no evidence that either defendant had physical contact with any officers, and, unlike Romero, they did not receive a three-level enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(A) for offenses involving physical contact. Daniel Johnson's guideline range was 4-10 months, and Daryl Johnson's guideline range was 0-6 months. The Court gave both defendants guideline sentences. Daniel Johnson was sentenced to 4 months and Daryl Johnson to 30 days' incarceration

Evans, a former West Virginia state legislator, joined the storming of the Rotunda Doors after livestreaming the mob on the East Side of the Capitol building for over an hour to his public Facebook page. While rioters at the front of the mob assaulted police, Evans—from approximately 20 feet back—yelled encouragement. After the doors were breached, Evans enthusiastically pushed forward and entered the Capitol. Like the Johnsons, Evans did not receive a three-level

enhancement for offenses involving physical conduct. The court imposed sentence of three months, in the middle of Evans' guidelines range.

By contrast with the Johnsons and Evans, Cooke's offense did involve physical conduct. Cooke helped lead the charge of rioters who broke through the police line guarding the east side of the Capitol Building. Cooke later bragged that he was one of the first to break through the barricade. Cooke pushed against a bicycle rack barrier manned by police officers and encouraged other rioters to break through the police line, yelling obscenities along the way. Once the rioters had broken through the barricade, Cooke rushed to the Capitol steps and then up to the building itself. Cooke used a flagpole carrying an American flag to strike one of the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass." Cooke eventually left the restricted area without entering the building soon after his eyes became irritated with pepper spray. Afterwards, Cooke was cooperative with law enforcement officers when they interviewed him. Judge Lamberth sentenced Cooke to a year and a day of imprisonment, in the middle of Cooke's 8-14 month guidelines range.

Cooke presents the closest comparison to Romero. Like Romero, Cooke engaged in multiple, direct confrontations with law enforcement, and received a three-level enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(A). Both Cooke and Romero attempted to enter the Capitol Building, though Romero succeeded where Cooke did not -- Romero, having brought a gas mask and protective gear, was not as easily deterred as Cooke. And though both Cooke and Romero had no criminal history and were cooperative with law enforcement, their conduct justified a term of imprisonment.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of

44

several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," so that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. Romero's obstruction and interference with law enforcement officers enabled other rioters to breach the Capitol and engage in violence. This conduct merits a sentence of imprisonment. Accordingly, a mid-range guidelines sentence of 11 months would not create an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[21] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990),

---

[21] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Romero must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Romero played in the riot on January 6.[22] (*See* Plea Agreement at ¶ 13.) As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Romero's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 113.

---

[22] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 11 months.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


BY:  */s/  Robert Juman*
ROBERT JUMAN
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov

47